UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| LEONARD MCQUAY, <br> DUKE HENDERSON, <br><br>       Plaintiffs, <br><br> v. <br><br> STATE OF INDIANA (I.D.O.C.), <br> JEANNE WATKINS, <br> ROBERT MARSHALL, <br> TERESA LITTLEJOHN, <br> RICHARD BROWN, <br><br>       Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )    No. 2:18-cv-00106-JPH-DLP <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The Indiana Department of Correction ("IDOC") has confiscated certain publications from prisoners Leonard McQuay and Duke Henderson and continues to prevent them from receiving certain publications. Based on these actions, Mr. McQuay and Mr. Henderson bring claims alleging infringement of their right to free expression, race discrimination, and violations of state tort law. Defendants have moved for summary judgment on all claims. For the reasons below, that motion is **GRANTED in part and DENIED in part**.

## I.
## Facts and Background

Although the Court views and recites the evidence "in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor," *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009), most of the following facts are uncontested, *see* dkt. 48 at 3.

1

### A. The Parties

Plaintiffs are incarcerated at Wabash Valley Correctional Facility ("Wabash Valley").  Dkt. 1-2 at 1–2 ¶ 2; dkt. 5 at 1 ¶ 2.  Defendant State of Indiana operates Wabash Valley through the IDOC, *id.*, and Defendant Richard Brown served as Wabash Valley's warden, dkt. 1-2 at 2 ¶ 4, dkt. 5 at 1 ¶ 4.  Defendant Jeanne Watkins worked as its "mail room supervisor," dkt. 48-1 at 2 ¶ 4 (Bensheimer Aff.); Defendant Robert Marshall acted as an "Internal Affairs Investigator," *id.*; and Defendant Teresa Littlejohn reviewed inmate grievances alongside Mr. Marshall, *see* dkt. 1-2 at 6–8 ¶¶ 20, 24, 27; dkt. 5 at 3 ¶¶ 20, 24, 27.

### B. Relevant IDOC Policies and Procedures

Mailroom staff at Wabash Valley screen "all incoming mail" by opening any correspondence sent to an offender, verifying and recording receipt of any property, inspecting for contraband, and removing any prohibited property. Dkt. 48-1 at 4 ¶¶ 12-13 (Bensheimer Aff.); *see* dkt. 48-2 at 9, 20–23. "[P]rohibited property" includes "printed matter" that "threatens the security of the public or the facility."  Dkt. 48-1 at 4 ¶ 13 (Bensheimer Aff.).  The Wabash Valley "Offender Correspondence Policy" allows IDOC employees to confiscate or withhold incoming inmate correspondence if "the Department has reasonable grounds to believe that" it (1) "[p]oses an immediate danger to the safety of an individual or a serious threat to the security of the facility or program," (2) was sent by another inmate, or (3) "contains contraband or prohibited property."  Dkt. 48-2 at 4, 9.  This is an all-or-nothing rule; if "a

2

portion of the printed matter is to be excluded . . . , the entire printed matter shall be excluded" and staff cannot "remove the offending portions . . . and give the remainder to the offender." Dkt. 48-1 at 4 ¶ 13 (Bensheimer Aff.); dkt. 48-2 at 23. IDOC does not "engage in 'blanket' censorship of a given periodical" and censors printed material "on an issue-by-issue basis." Dkt. 48-1 at 7 ¶ 24 (Bensheimer Aff.); dkt. 48-2 at 23.

Based on this policy, IDOC withholds material that "promotes" or "glorifies" a "security threat group" ("STG") or could inflame racial tensions within the facility. Dkt. 48-1 at 3 ¶¶ 9–10 (Bensheimer Aff.). IDOC defines an STG as "a group of offenders that set themselves apart from others; pose a threat to security or safety of staff or offenders; or, are disruptive to programs or the orderly management of the facility." *Id.* at 2 ¶ 6 (Bensheimer Aff.); *see* dkt. 48-3 at 2. The "New Black Panther Party" and the "original Black Panther Party" are examples of STGs under this policy. Dkt. 48-1 at 2 ¶ 6, 3 ¶ 11 (Bensheimer Aff.). According to Mr. Bensheimer, IDOC's Deputy Chief for Internal Affairs and STG Operations, the New Black Panther Party is "starkly anti-white" and "antisemitic," and its members "oftentimes glorify the violent acts of members of the original Black Panther Party and seem to take inspiration from such acts." *Id.* at 1 ¶ 1, 3–4 ¶ 11. The New Black Panther Party "is designated as an STG due to its gang-related activity." *Id.* at 4 ¶ 11.

The Offender Correspondence Policy also applies to "correspondence containing STG signs or symbols, articles about weapons, alcohol, and narcotics, and articles that promote violence, or any kind of organized

3

demonstrations or strikes."  *Id.* at 3 ¶ 10; dkt. 48-3 at 8, 10.  Wabash Valley staff "routinely confiscate[] or censor[] printed materials" from offenders of all races, including those advocating white supremacist ideas.  Dkt. 48-1 at 8 ¶¶ 25–26 (Bensheimer Aff.).

### C. Publications Withheld from Plaintiffs

Defendants confiscated multiple newspaper issues from both Mr. McQuay and Mr. Henderson, and three books and a labor union newsletter from Mr. McQuay (collectively "Materials").  Dkt. 48 at 1, 3; dkt. 1-2 at 8 ¶ 28; dkt. 5 at 3 ¶ 28.  Although these Materials have not been designated as exhibits here, *see* dkt. 66 at 1, other evidence in the record describes the content of some of the Materials and why they were confiscated by the IDOC.

#### 1. *Bay View* Newspaper

A December 2015 *San Francisco Bay View* newspaper article by "Indiana offender Shaka Shakur" violated IDOC policy because it was "an unauthorized correspondence between himself" and other inmates within the IDOC prison system.  Dkt. 48-1 at 6 ¶ 21 (Bensheimer Aff.).  Since December 2015, IDOC reviewed and withheld "each subsequent issue" of the *Bay View* newspaper[1] from inmates, *id.* at 6 ¶ 22, including:

- The January 2016 edition because it "include[d] advertising for pen-pals," which violated IDOC policy "prohibit[ing] offenders from

---

[1] IDOC does not have "the actual, original issues" of the *Bay View* newspaper that it confiscated, stating that they were likely "disposed of over two years ago."  Dkt. 48-1 at 5–6 ¶ 19 (Bensheimer Aff.).

4

    using the mail service to solicit funds or other items of value." *Id.*
at 6–7 ¶ 23; *see* dkt. 48-2 at 18–19.

- The February 2016 edition because an article could have "inspire[d] violence against officers and other inmates." Dkt. 48-1 at 6–7 ¶ 23 (Bensheimer Aff.).

- The April 2016 edition because it contained an article "advocat[ing] widespread prisoner disobedience as a means of effecting change in all prisons." *Id.*

- The June 2016 edition because it "contained an image of a gorilla with a bleeding pig in its mouth," which IDOC viewed as "promoting violence against prison officials." *Id.*

- The July 2016 edition because an advertisement "clearly solicit[ed] the reader to participate" in a "national prison strike" and contained "an ominous warning that prison 'slavery' is about to come to an end." *Id.*

Defendants also confiscated newspapers from Mr. McQuay on the following dates:[2]

- On about February 9, 2016, they confiscated an article "which included discussion of the history of the Black Panther Party." Dkt. 1-2 at 6 ¶ 17; dkt. 5 at 3 ¶ 17.

---

[2] The issue dates for these confiscated newspapers are unclear from the record.

- On about April 19, 2016, they confiscated an article including "a discussion of the Republic of New Afrika." Dkt. 1-2 at 6–7 ¶ 21; dkt. 5 at 3 ¶ 21.

Defendants also confiscated issues of the *Bay View* newspaper from Mr. Henderson on September 15, 2016, November 14, 2016, December 12, 2016, January 17, 2017, and February 16, 2017. Dkt. 1-2 at 9 ¶ 35; dkt. 5 at 4 ¶ 35.

Defendants Littlejohn and Marshall denied Mr. McQuay's March 2016 grievance appeal relating to a *Bay View* newspaper article about the Black Panther Party, based on their conclusion that the publication "was 'advocating racism.'" Dkt. 1-2 at 6 ¶¶ 19–20; dkt. 5 at 3 ¶¶ 19–20. They also denied another of Mr. McQuay's grievances about the *Bay View* newspaper, stating that "the publication was 'controversial' and 'demeaning to other races.'" Dkt. 1-2 at 7 ¶ 24; dkt. 5 at 3 ¶ 24.

### 2. Books

Around August 30, 2016, Defendants confiscated three books from Mr. McQuay. First, they confiscated his copy of *Drug War Capitalism* by Dawn Paley. Dkt. 1-2 at 7 ¶ 25; dkt. 5 at 3 ¶ 25. Defendants Littlejohn and Marshall denied Mr. McQuay's grievance about this book because they found that it "promote[s] drugs and war." Dkt. 1-2 at 7–8 ¶ 27; dkt. 5 at 3 ¶ 27. Mr. Bensheimer stated that this book "was determined to violate" IDOC policy "because it discusses in detail the organizational structure and global operations of the international drug trade." Dkt. 48-1 at 4–5 ¶ 15 (Bensheimer

6

Aff.). However, Defendants returned this book to Mr. McQuay on October 18, 2016. *Id.* at 5 ¶ 16; dkt. 48-4.

Second, Defendants confiscated Mr. McQuay's copy of *Settlers: The Mythology of the White Proletariat from Mayflower to Modern* by J. Sakai. Dkt. 1-2 at 7 ¶ 25; dkt. 5 at 4 ¶ 25. Defendants Littlejohn and Marshall denied Mr. McQuay's grievances because they claimed that the book "promotes hatred and discrimination against races." Dkt. 1-2 at 8 ¶ 27; dkt. 5 at 3 ¶ 27. Mr. Bensheimer stated that this book violates IDOC policy because:

> [I]t discusses, in inflammatory terms, how the United States was 'built on the theft of Indigenous lands and of Afrikan labor, on the robbery of the northern third of Mexico, the colonization of Puerto Rico, and the expropriation of the Asian working class' and seems to advocate or promote violence against whites by these ethnic groups as a means of retribution.

Dkt. 48-1 at 5 ¶ 18 (Bensheimer Aff.).

Finally, Defendants confiscated Mr. McQuay's copy of *Narcoland: The Mexican Drug Lords and Their Godfathers* by Anabel Hernandez. Dkt. 1-2 at 7 ¶ 25; dkt. 5 at 4 ¶ 25. Defendants Littlejohn and Marshall denied Mr. McQuay's grievance about this book because they found that it "promote[s] drugs and war." Dkt. 1-2 at 7–8 ¶ 27; dkt. 5 at 3 ¶ 27. Mr. Bensheimer stated that this book violates IDOC policy "because it discusses in detail the organizational structure and operations of the Mexican drug trade and appears to glorify the exploits of cartel leaders like 'El Chapo' Guzman," the former leader of the Sinaloa Cartel. Dkt. 48-1 at 5 ¶ 17 (Bensheimer Aff.).

### 3. IWW Newsletter

Around July 12, 2016, Defendant Watkins confiscated Mr. McQuay's newsletter from the labor union Industrial Workers of the World ("IWW"). Dkt. 1-2 at 8 ¶ 28; dkt. 5 at 3 ¶ 28.

**D. Procedural History**

In December 2017, Plaintiffs filed their complaint in Indiana state court, alleging that Defendants engaged in "discriminatory censorship and destruction of nonsubversive political, academic, and journalistic literature belonging to African American prisoners" held at Wabash Valley. Dkt. 1-2 at 1 ¶ 1. Plaintiffs have brought claims for:

(A) infringement of their right to free expression under the First Amendment through 42 U.S.C. § 1983;

(B) racial discrimination under the Fourteenth Amendment through 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, and 42 U.S.C. § 1981; and

(C) violations of several state common law torts.

*See id.* at 1, 10–13; dkt. 12 at 1.

Defendants removed the case to this Court, dkt. 1, and filed a motion for summary judgment on all federal claims and for the Court to relinquish jurisdiction over the state law tort claims.[3] *See* dkt. 47; dkt. 48 at 23.

---

[3] Although Plaintiffs' complaint frames the suit as a "Class Action," *see* dkt. 1-2 at 1, they have not sought class certification, so Defendants direct their motion for summary judgment at Plaintiffs' individual claims, dkt. 48 at 2; *see* dkt. 12 at 2.

8

## II.
## Applicable Law

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).

## III.
## Analysis

### A. First Amendment Claim

"[P]risoners have protected First Amendment interests in both sending and receiving mail." *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999); *see Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011). However, a prison restriction on inmate correspondence withstands First Amendment scrutiny when it's "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). "[S]everal factors are relevant in determining the reasonableness" of a prison regulation: (1) the existence of a

9

"valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it;" (2) the presence of "alternative means of exercising" the restricted right; (3) the "impact" of an "accommodation of the asserted constitutional right . . . on guards and other inmates, and on the allocation of prison resources generally;" and (4) the availability of "ready alternatives" for furthering the governmental interest. *Id.* at 89–90.

Defendants do not dispute that their actions "impinge on [Plaintiffs'] constitutional rights," *id.* at 89, to "receiv[e] printed materials and uncensored communications," *see* dkt. 48 at 20. Instead, they argue that they applied prison policies to Plaintiffs reasonably under *Turner*. *See* dkt. 48 at 9–20.[4] Plaintiffs respond that Defendants have not satisfied the first *Turner* factor, which requires a valid, rational relationship between the confiscation of Materials and a legitimate, neutral government interest. *See* dkt. 66 at 3–4; dkt. 67 at 4.

---

[4] Defendants also argue that IDOC's Offender Correspondence Policy (and not just Defendants' application of it) is constitutional. *See* dkt. 48 at 2. But Plaintiffs' response brief only discusses an as-applied challenge to IDOC's policy. *See* dkt. 66 at 3–4 (arguing that Defendants have failed "to prove that [the Materials] are *in fact* in violation of IDOC policy) (emphasis in original); *HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cty. of Marion, Indiana*, 889 F.3d 432, 439 (7th Cir. 2018) (stating that an "as-applied challenge" requires determining whether the government's application of its policies to plaintiffs results in an unconstitutional effect). To the extent that Plaintiffs' complaint brought a facial challenge to IDOC policies, Plaintiffs have abandoned that claim by failing to argue it in their response brief. *See Cain v. City of Muncie*, No. 1:13-CV-01127-SEB, 2015 WL 2074705, at *12 (S.D. Ind. May 4, 2015) (citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011)). And even if Plaintiffs had properly offered argument for a facial challenge, Defendants have met their burden to justify IDOC's Offender Correspondence Policy under *Turner*. *See infra* p. 14–15; *Willis v. Comm'r of Indiana Dep't of Correction*, No. 1:16-CV-02053-TWP-DKL, 2017 WL 2797786, at *5–6 (S.D. Ind. June 28, 2017) (finding that IDOC's Offender Correspondence Policy "easily satisfies the *Turner* reasonableness test").

The first *Turner* factor "serves as a threshold, and the district court need not explicitly articulate its consideration of each" other factor. *Van den Bosch*, 658 F.3d at 785 n.6. While the party challenging the application of a prison policy bears the ultimate burden of persuasion, *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), "prison officials must still articulate their legitimate governmental interest [for their conduct] and provide some evidence supporting their concern," *Nigl v. Litscher*, 940 F.3d 329, 334 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 2772 (2020). At the summary judgment stage, courts "must distinguish between inferences relating to disputed facts and those relating to disputed matters of professional judgment." *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) (citing *Beard v. Banks*, 548 U.S. 521, 530 (2006) (plurality opinion)). For disputed facts, courts "draw all reasonable inferences" in the nonmoving party's favor. *Zerante*, 555 F.3d at 584 (citation omitted). But for disputed matters of professional judgment, courts must accord "deference to the views of prison authorities." *Singer*, 593 F.3d at 534.

Defendants argue that they confiscated the Materials in accordance with IDOC policies designed to protect the state's legitimate and neutral interests of preserving order, security, and safety, and that there was a specific connection between these interests and the confiscation of the Materials. Dkt. 48 at 3, 9-10, 14-15. Plaintiffs do not challenge the legitimacy of the interests cited by Defendants. *See* dkt. 66. Rather, they argue that because Defendants have not produced copies of the confiscated Materials, they have not shown a

11

connection between the stated interests and the IDOC's confiscation and blocking of the Materials. *See id.* at 2 ¶ 7, 4; dkt. 1-2 at 8 ¶ 33.

Plaintiffs cite no authority, however, for the proposition that a court must review copies of confiscated reading materials to evaluate whether the confiscation was lawful under *Turner*. *See* dkt. 66. Moreover, Plaintiffs have not designated evidence that calls into doubt the accuracy of Mr. Bensheimer's descriptions of the content of the Materials. Therefore, the Court accepts Defendants' descriptions of the Materials. *See* Local Rule 56-1(f). For any Materials that Defendants have offered a sufficient explanation for confiscating, the burden shifts to Plaintiffs to "call that explanation into question." *Singer*, 593 F.3d at 537.

In *Singer*, the district court found that there was a rational relationship between a prison's ban of certain materials and a legitimate government interest. *Id.* at 535. The "sole evidence" presented by defendants was the affidavit of a prison employee explaining how banning "co-operative games" was related to a legitimate government interest in maintaining prison security. *Id.* Because the plaintiff's designated affidavits contradicting this testimony came from individuals who lacked expertise in prison security, the district court's grant of summary judgment was affirmed. *Id.* at 537–40. The Seventh Circuit held that prison officials need to demonstrate only that they "could rationally have seen a connection between the policy and their ultimate penological goals"

12

before the burden shifts to the plaintiff "to present evidence to call that explanation into question." *Id.* at 537–38.

### 1. Certain *Bay View* Newspaper Issues & IWW Newsletter

The burden doesn't shift under *Singer*, however, for the confiscated Materials that Defendants have not described or offered justification for confiscating and banning. *See id.* Defendants admit to withholding "each subsequent issue" of the *Bay View* newspaper from inmates after December 2015. Dkt. 48-1 at 6 ¶ 22 (Bensheimer Aff.); dkt. 48 at 5. But they have not connected a government interest to the April 19, 2016 confiscation of Mr. McQuay's" *Bay View* newspaper "which included a discussion of the Republic of New Afrika," dkt. 1-2 at 6–7 ¶ 21; dkt. 5 at 3 ¶ 21, or to confiscations of Mr. Henderson's copies of the *Bay View* newspaper on September 15, 2016, November 14, 2016, December 12, 2016, January 17, 2017, and February 16, 2017, dkt. 1-2 at 9 ¶ 35; dkt. 5 at 4 ¶ 35. In addition, Defendants have not explained why they confiscated the IWW newsletter on July 12, 2016. *See* dkt. 1-2 at 8 ¶ 28; dkt. 5 at 3 ¶ 28.

For these seven confiscations, the Court cannot defer to IDOC's "professional judgment," *Singer*, 593 F.3d at 534, because Defendants have not offered any reason why these materials were confiscated. Without explaining how "they could rationally have seen a connection between the policy and their ultimate penological goals," *Singer*, 593 F.3d at 538, Defendants are not entitled to summary judgment for these publications.

13

### 2. Remaining Publications

In contrast, Defendants have articulated why they confiscated the remaining publications. Regarding confiscated issues of the *Bay View* newspaper:

(1) The December 2015 issue violated IDOC policies against intra-inmate mail correspondence. Dkt. 48-1 at 6 ¶ 21 (Bensheimer Aff.).

(2) The January 2016 issue violated IDOC policies on inmate fund solicitation. *Id.* at 7 ¶ 23(a).

(3) The February 2016 issue promoted violence against inmates and prison guards and related to STGs. *Id.* at 2 ¶ 6, 7 ¶ 23(b).

(4) The April 2016 promoted prisoner disobedience. *Id.* at 7 ¶ 23(c).

(5) The June 2016 issue promoted violence against prison officials. *Id.* ¶ 23(d).

(6) The July 2016 issue promoted prisoner disobedience. *Id.* ¶ 23(e).

Next, prison officials "determined" that the books *Drug War Capitalism* and *Narcoland* violated IDOC policy because they "discuss[] in detail the organizational structure and . . . operations" of the international drug trade. *Id.* at 4–5 ¶¶ 15, 17. And officials concluded that the *Settlers* book violates IDOC policy because it uses "inflammatory terms" and "seems to advocate or promote violence against whites." *Id.* at 5 ¶ 18.

Defendants have thus offered plausible explanations for confiscating these publications. And once prison officials "provide[] the court with a plausible explanation for the . . . policy," "the burden shift[s] to [the challenger]

14

to present evidence to call that explanation into question." *Singer*, 593 F.3d at 536–37. Plaintiffs must use this "opportunity to respond" to meet their burden "to set forth specific facts showing that there is a genuine issue for trial." *Beard*, 548 U.S. at 534 (quoting Fed. R. Civ. P. 56(e)).

The only evidence that Plaintiffs designate in response are their own affidavits. Plaintiffs do not contend that Mr. Bensheimer's descriptions of the Materials are not accurate, but challenge his professional judgment by arguing that the Materials "were not in violation of IDOC policy" because they were "entertaining, educational, and interesting" and "pose no threat to . . . the security" of Wabash Valley "or any other prison facility" in Indiana. Dkt. 66 at 6 ¶ 3 (McQuay Aff.); *id.* at 7 ¶ 3 (Henderson Aff.). When matched against a prison official's professional judgment, to which courts must accord deference, these inmate affidavits do not "raise a genuine issue of material fact" about the relationship between confiscated Materials and prison security concerns. *See Singer*, 593 F.3d at 534, 536. Plaintiffs have thus not presented evidence to rebut Defendants' contention that the confiscated and/or banned publications contain content that could disrupt prison order and security. *See Van den Bosch*, 658 F.3d at 788; *see also Singer*, 593 F.3d at 533–36 (holding plaintiff's designation of 15 affidavits inadequate to rebut prison official's testimony on the danger of a role-playing game). As a result, for these publications, Defendants are entitled to summary judgment.

15

### B. Race Discrimination Claims

#### 1. Fourteenth Amendment Equal Protection Claim

Defendants contend that they are entitled to summary judgment on Plaintiffs' equal protection claim because their actions "pass[] constitutional muster" under the deferential *Turner* standard. Dkt. 47 at 1–2 ¶¶ 3–5; dkt. 48 at 2. But *Turner* does not apply to racial discrimination claims in the prison context. *See Johnson v. California*, 543 U.S. 499, 502, 510–15 (2005) ("We therefore reject the *Turner* standard for racial classifications in prisons because it would make rank discrimination too easy to defend."). Instead, like "all racial classifications imposed by government," prison racial distinctions are subject to strict scrutiny. *Id.* at 505. To not offend the Constitution, state actors must justify their race-based actions by proving that they are "narrowly tailored measures that further compelling governmental interests." *Id.*

Defendants thus did not address the correct legal standards in their motion or briefing. *See* dkt. 47, dkt. 48, dkt. 67. Federal Rule 56(a) requires a movant on summary judgment to show that it is "entitled to judgment as a matter of law." *See United States v. Luce*, 873 F.3d 999, 1008 n.31 (7th Cir. 2017) (requiring a "properly supported . . . motion"). "The party pursuing the motion must make an initial showing that the agreed-upon facts support a judgment in its favor." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). As a result, when a court "think[s] the motion insufficiently supported . . . or off-base on the relevant legal principles," it has "grounds for denying the motion." *Id.* at 603. Because Defendants have not

16

shown that the governing law supports their position, they have not shown that they are entitled to summary judgment on the equal protection claim.

However, under Federal Rule of Civil Procedure 56(f), district courts may consider summary judgment "on grounds not raised by a party" "[a]fter giving notice and a reasonable time to respond." *See Lalowski v. City of Des Plaines*, 789 F.3d 784, 794 (7th Cir. 2015). This involves offering the parties "the chance to marshal evidence and argument" on their positions. *Hotel 71 Mezz Lender LLC*, 778 F.3d at 603.

That procedure is appropriate here. "To prove an equal-protection claim, [Plaintiffs] must show . . . a discriminatory effect and that the defendants were motivated by a discriminatory purpose." *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017) (citation omitted)); *see Washington v. Davis*, 426 U.S. 229 (1976). "To prove discriminatory effect, [a plaintiff] must show that he is a member of a protected class and that he was treated differently from a similarly situated member of an unprotected class." *Alston*, 853 F.3d at 906. And to prove discriminatory purpose, a plaintiff must show that a defendant "selected a particular course of action at least in part 'because of' its adverse effects upon an identifiable group." *Id.* at 907 (citation omitted).

While Defendants mentioned the equal protection claim in their motion for summary judgment, they did not brief or designate evidence on the elements required to show a genuine issue of material fact for trial. And Plaintiffs did not clearly address the equal protection claim in their response. Dkt. 66. The Court therefore gives notice under Rule 56(f)(2) of its intent to

17

enter summary judgment for Defendants on this claim if the designated evidence does not show a triable issue of fact on discriminatory effect or discriminatory purpose. *See Hotel 71 Mezz Lender LLC*, 778 F.3d at 603. As a result, if Plaintiffs wish to maintain this claim, they **SHALL** offer arguments and designate evidence on discriminatory effect and purpose **by March 1, 2021**. Defendants **MAY RESPOND by March 15, 2021**.

### 2. Title VI Claim

Defendants move for summary judgment on the Title VI claim, arguing that their "actions could only violate Title VI if they violate the Equal Protection Clause." Dkt. 67 at 5; *see Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) ("Title VI . . . proscribes only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment.") (citation omitted). Plaintiffs did not respond to this argument. *See* dkt. 66.

Because Defendants rely on the Equal Protection Clause here and since they have not shown that they are entitled to summary judgment on that claim, they are also not entitled to summary judgment on this ground. However, the Rule 56(f) notice above also applies to the Plaintiffs' Title VI claim. As a result, if Plaintiffs do not offer evidence showing a triable issue of fact on their Equal Protection claim at trial, the Court will also grant summary judgment on their Title VI claim.

### 3. § 1981 Contracts Claim

"To establish a prima facie claim of [§ 1981] discrimination, [a plaintiff] must show that (1) he is a member of a racial minority; (2) the defendants had

18

the intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006), *as amended on denial of reh'g* (May 25, 2006).

Defendants contend that this last element has not been met because there "is simply no contract at issue in this case." *See* dkt. 67 at 4–5. Plaintiffs have not designated evidence that their suit "concern[s] the making or enforcing of a contract" or any evidence of a relevant contract. *See* dkt. 1-2 at 11 ¶ 44; dkt. 66. Defendants are thus entitled to summary judgment on this claim.

### C. State Law Tort Claims

Last, Defendants ask the Court to relinquish jurisdiction over Plaintiffs' state law claims. Dkt. 47 at 2 ¶ 6; dkt. 48 at 21–22. But because some of Plaintiffs' federal claims remain, the Court retains supplemental jurisdiction over the state law claims at this time. *See* 28 U.S.C. § 1367(a).

## IV.
## Conclusion

Defendants' motion for summary judgment, dkt. [47], is **GRANTED in part and DENIED in part**.

If Plaintiffs wish to maintain their equal protection and Title VI claims, they **SHALL** offer arguments and designate evidence on discriminatory effect and purpose **by March 1, 2021**. Defendants **MAY RESPOND by March 15,**

19

**2021**.  Magistrate Judge Pryor is asked to hold a status conference to discuss settlement.

**SO ORDERED.**

Date: 1/29/2021

                                                    James Patrick Hanlon
                                                  United States District Judge
                                                  Southern District of Indiana

Distribution:

Michael J. Blinn
INDIANA ATTORNEY GENERAL
michael.blinn@atg.in.gov

Nancy Kay Goldburg
INDIANA ATTORNEY GENERAL
nancy.goldburg@atg.in.gov

Christopher Carson Myers
CHRISTOPHER C. MYERS & ASSOCIATES
cmyers@myers-law.com